**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JULIANNE L'ARGENT,

                  **Plaintiff,**

-vs-                                   **Case No.  6:04-cv-1787-Orl-31KRS**

UNITED SPACE ALLIANCE, LLC,

                  **Defendant.**

_____

**ORDER**

The Plaintiff, Julianne L'Argent ("L'Argent"), sued the United Space Alliance, LLC ("USA"), alleging that she was retaliated against in violation of the Florida Civil Rights Act and Title VII of the Civil Rights Act of 1964.[1]   This matter is presently before the Court on USA's Motion for Summary Judgment (Doc. 61) and L'Argent's Memorandum in Opposition thereto (Doc. 63).

**I.**      **Background**

A. Parties

L'Argent worked for USA as a Quality Control Inspector ("QCI").  Her responsibilities included: (1) performing inspections to determine the condition of hardware; (2) monitoring and participating in testing to determine whether hardware components performed within design parameters; (3) identifying and documenting non-conformities; and (4) ensuring the

---

[1] L'Argent's Second Amended Complaint appears at Doc. 40.

documentation of the receipt, processing and close-out of equipment for use and of flight hardware for launch.[2]

USA is a contractor to the National Aeronautics and Space Administration ("NASA") for the Space Shuttle Program, and is therefore responsible for, *inter alia*, technical, engineering and support functions required to process, overhaul, maintain, and prepare Space Shuttles for launch. These responsibilities include assuring the quality of flight hardware and its processing.

B. Facts

*1) L'Argent's relationship with a co-worker, and subsequent difficulties at work*

L'Argent began working as a QCI for USA in 1996.  (Doc. 63, Att. 2 at 1).  She worked at the Orbiter Processing Facility 3 ("OPF3"),[3] where she performed inspections of the Space Shuttle. (*Id*. at 4).  In June of 2002, she began a romantic relationship with Matt Todd ("Todd"), one of her co-workers, which lasted until November of 2002.[4]  (Doc. 63, Att. 7 at 22-23).  On November 11, 2002, Todd returned to work after an extended absence, and began "constantly glaring [and] staring at" L'Argent, and giving her mean looks.  (Doc. 58, Att. 4 at 3; Doc. 63, Att. 2 at 2). L'Argent complained about Todd's actions to several people, including her supervisor, Steve Kane ("Kane").  (*Id*).  Kane investigated her complaint, and questioned Todd, who denied the accusations.  (Doc. 58, Att. 4 at 3).  Kane cautioned Todd to be careful not to do anything that L'Argent could perceive as inappropriate.  (*Id*.).

---

[2] This documentation reflected that all of the required tasks and checks had been properly performed.

[3] There are three Orbiter Processing Facilities, numbered 1 ("OPF1"), 2 ("OPF2") and 3 ("OPF3").  (Doc. 63, Att. 2 at 4).  These facilities are "hangar-like facilities in which the horizontal processing of the orbiters takes place."  (Doc. 58, Att. 4 at 2).

[4] Todd ended the relationship.  (Doc. 58, Att. 4 at 3).

L'Argent complained to Kane again in December of 2002 about Todd glaring at her, and told Kane that she did not think that she and Todd could work in the same facility. (Doc. 58, Att. 4 at 3). Kane moved Todd from OPF3 to OPF1 to create some separation between him and L'Argent, but Todd continued to return to L'Argent's work area at OPF3 for work purposes and because his girlfriend, Sharon Stewart ("Stewart") worked in OPF2. (Doc. 58, Att. 4 at 4; Doc. 63, Att. 2 at 2). L'Argent would see Todd in the cafeteria, along with Stewart. (Doc. 63, Att. 8 at 18). Various people made comments to L'Argent, and she felt intimidated by the situation.[5] (Doc. 63, Att. 9 at 3).

On December 12, 2002, L'Argent encountered Todd near a locker room and "he threw open a door so hard that he put a hole in the wall." (Doc. 63, Att. 2 at 2). L'Argent made a third complaint about the door incident and about Todd glaring at her, and also complained that Stewart was following her and giving her dirty looks, and that several of Todd's friends were staring at her and giving her mean looks. (Doc. 58, Att. 4 at 4). She felt threatened by these events, and was upset as a result. (*Id.*). Kane interviewed everyone who allegedly witnessed the door incident. (*Id.*). When Kane spoke with Todd, Todd stated that he had not attempted to harm L'Argent, and then complained that L'Argent was waging a campaign of harassment against him and Stewart. (*Id.* at 4-5).

Kane's investigations did not uncover any evidence that Todd, Stewart, or Todd's friends had violated any USA policy or any law. (Doc. 58, Att. 4 at 5). After these events, L'Argent

---

[5] At some point in November of 2002, an anonymous complaint had been made to USA's ethics hotline that Stewart had made threats about L'Argent to a co-worker. (Doc. 58, Att. 2 at 3). USA's ethics office conducted an investigation of this complaint, but found no evidence showing that Stewart violated any USA policy or any law. (Doc. 58, Att. 2 at 3).

suggested to Mike Sledge, an employee relations representative in the Employee & Labor Relations Department at USA, that Todd's transfer to OPF1 was not sufficient, and that there needed to be a greater geographical separation between L'Argent and Todd.  (Doc. 63, Att. 8 at 18-19).

### 2) USA attempts to resolve the situation

L'Argent met with her manager, Betty Muldowney ("Muldowney") and Kane on January 22, 2003, regarding her complaints that Todd harassed her.[6]  (Doc. 63, Att. 2 at 2). Muldowney decided that L'Argent and Todd needed to be geographically separated in such a way as to eliminate any reason for them to be near each other during work.  (Doc. 58, Att. 4 at 5).  Kane concurred in that decision.  (*Id*.; Doc. 58, Att. 5 at 4).  Muldowney thus told L'Argent that she was being transferred to the Hypergol Maintenance Facility ("HMF"), and that it was easier to move L'Argent than to move Todd.[7]  (*Id*.; Att. 7 at 11-12).  Muldowney also told L'Argent that she was crazy and needed to get help.[8]  (Doc. 63, Att. 2 at 2; Att. 7 at 12).[9]

---

[6] Kane reported on this situation to Muldowney as the situation "escalated" over time, and in early January of 2003, asked Muldowney to get involved to help resolve the situation.  (Doc. 63, Att. 9 at 2-3).

[7] L'Argent did not want to be transferred to HMF, and felt that Muldowney did not believe her about her complaints.  (Doc. 63, Att. 2 at 2).

[8] Muldowney acknowledges that she advised L'Argent that USA had an employee assistance program that she could attend if she wanted to.  (Doc. 63, Att. 9 at 7).  Muldowney states that this is a standard management recommendation for someone who, like L'Argent, was emotionally distraught. (*Id*.).

[9] Also at that meeting, L'Argent told Muldowney that she (L'Argent) had called the FBI in early January of 2003 to report a money laundering scheme in which she believed Todd was involved, and that the FBI had given her a polygraph test about her claim, which she passed.  (Doc. 63, Att. 2 at 2; Att. 7 at 12-13, 16). L'Argent also states, however, that at the time of this meeting, neither Kane

Muldowney arrived at her decision to transfer L'Argent to HMF after considering a number of factors, including: (1) L'Argent and Todd held basically the same position and had the same skill level; (2) Muldowney controlled the people at all three OPFs and at HMF, all of whom were under her direct supervision; (3) Muldowney did not have control over Stewart, and could not transfer her without speaking with Stewart's managers first; (4) L'Argent also complained about a number of other people; and (5) the three OPFs are in a common area, whereas HMF is six miles away and has its own amenities.  (Doc. 58, Att. 5 at 3-4; Doc. 63, Att. 9 at 3-4).  Muldowney determined that it would be more practical to transfer L'Argent to HMF because: (1) transferring only Todd would still leave Stewart in L'Argent's area, which presented the possibility of conflict between the two, and would allow Todd legitimate reasons to return to OPF3, such as to pick up Stewart after work; (2) she could remove L'Argent from the situation by transferring her six miles away to HMF, where she would have an equivalent job in terms of skill level and pay; and (3) HMF utilized QCIs like L'Argent, and thus she could be transferred there.  (Doc. 58, Att. 5 at 4-5; Doc. 63, Att. 9 at 4).  Muldowney characterizes L'Argent's transfer to HMF as a "business decision" that supported a "clear resolution to the situation," and as the only way to completely and efficiently remedy L'Argent's complaints.[10]  (Doc. 58, Att. 5 at 6; Doc. 63, Att. 9 at 6).  She

_____

nor Muldowney were aware that she had called the FBI.  (Doc. 63, Att. 7 at 43; *see also* Att. 9 at 3).  In addition, in January of 2003, just prior to the launch of the space shuttle Columbia, L'Argent made an anonymous call to the FBI hotline alleging that Todd was engaged in terroristic activities.  (Doc. 58, Att. 2 at 3).  An immediate FBI investigation identified her as the caller and determined that her allegations lacked merit.  (*Id*.).

[10] Muldowney asserts that she did not transfer L'Argent in retaliation for her previous complaints.  (Doc. 58, Att. 5 at 6).

did not perceive L'Argent's reassignment to HMF as detrimental in any way.[11]  (Doc. 58, Att. 5 at 4).

On January 27, 2003, L'Argent was placed on a 30-day medical leave of absence due to stress.  (Doc. 63, Att. 2 at 2).  When she returned to work, she was placed at OPF3 for one week, during which time Todd was assigned to HMF.[12]  (*Id*.).  The following week, she was transferred to HMF and Todd returned to OPF3.  (*Id*. at 3).  At HMF, L'Argent performed quality inspection on hypergols, which are what propel the Space Shuttle for short distances, such as when docking at a space station.  (Doc. 63, Att. 2 at 5; Att. 6 at 27).  She worked in the same job classification, performed essentially the same functions and work, and kept the same wages and benefits.  (Doc. 58, Att. 5 at 6; Doc. 63, Att. 9 at 7).  HMF is a more hazardous facility than OPF3 because there are more chemicals and fuels stored at HMF.  (Doc. 63, Att. 2 at 5).  Once she was transferred to HMF, she was no longer able to work directly on the Space Shuttle.[13]  (Doc. 63, Att. 2 at 4).

After L'Argent was transferred to HMF, she had two conversations with Patty Stratton ("Stratton") about the transfer.  (Doc. 63, Att. 7 at 15).  During the first conversation, L'Argent told Stratton about her call to the FBI, the polygraph and her transfer to HMF.  (*Id*. at 16-17).

---

[11] Muldowney asserts that the terms and conditions of L'Argent's employment were not changed as a result of her reassignment.  (Doc. 58, Att. 5 at 4).

[12] Todd was assigned to HMF in order to take him out of the environment at OPF3 so that the situation could be investigated fully.  (Doc. 58, Att. 5 at 3; Doc. 63, Att. 9 at 5-6).  This investigation arose because, prior to her leave of absence, L'Argent complained that her assignment to HMF was in retaliation for her complaints about Todd.  (Doc. 58, Att. 2 at 3).  USA's ethics office conducted an investigation which found no evidence of retaliation and determined that she had been transferred for legitimate business reasons.  (*Id*.).

[13] L'Argent asserts that HMF is a less prestigious assignment than OPF1, OPF2 and OPF3 because at those assignments, people work directly on the Space Shuttle, whereas they do not at HMF.  (Doc. 63, Att. 2 at 4-5).

L'Argent told Stratton that she believed she had been transferred to HMF because of the call she made to the FBI.  (*Id*. at 18).  Stratton told L'Argent that she believed L'Argent should not have been transferred and that she would look into the matter.  (*Id*.).

*3) L'Argent's situation immediately after her transfer*

When L'Argent was transferred to HMF, she did not have the proper badge to access that facility.[14]  (Doc. 63, Att. 2 at 3; Att. 10 at 9).[15]  Because she lacked the proper badge and access number, she had to be escorted in certain areas of HMF.  (Doc. 63, Att. 10 at 3).  Despite this fact, her ability to perform her normal functions was not impaired.  (Doc. 58, Att. 6 at 3).  Muldowney was aware that, when L'Argent was transferred to HMF, it would be necessary to get her a permanent badge.  (Doc. 63, Att. 9 at 7).  To get a permanent badge, USA submitted a security form to NASA and then had to wait for NASA to process it.  (*Id*. at 8; Doc. 63, Att. 10 at 3).  USA submitted this request immediately upon her transfer, and within two and one-half weeks of her transfer, NASA issued the necessary clearance.  (Doc. 58, Att. 6 at 3).[16]

At the time of her transfer, L'Argent had all of the certifications she needed to work as a QCI at HMF, but even if she did not have all of the available certifications, she did not need every available certification to be able to perform her job.[17]  (Doc. 63, Att. 9 at 7; Att. 10 at 3).  Although

---

[14] Because she worked at OPF3 prior to her transfer, she had no need for unescorted access credentials for HMF.  (Doc. 58, Att. 6 at 3).

[15] When Todd was transferred to HMF, he had full access and did not have to be escorted. (Doc. 63, Att. 10 at 3).

[16] L'Argent asserts that during her first six months at HMF she was not given codes to the locks to access the HMF work areas, and thus could only enter those areas with an employee who had the codes.  (Doc. 63, Att. 2 at 4).

[17] Certain certifications are used at HMF which L'Argent did not have, including SCAPE (Self Contained Atmosphere Protective Equipment), bonding and welding.  (Doc. 63, Att. 10 at 3).

L'Argent was not certified in hardline breathing, SCAPE or welding, these are not mandatory certifications to work as a QCI and HMF, and her lack of certification in these areas would not have limited the work she could perform at HMF.  (Doc. 63, Att. 9 at 7).

When she was transferred, Muldowney told her that the situation would be reevaluated in thirty days.  (Doc. 63, Att. 8 at 21).  Within no more than 90 days of L'Argent's transfer to HMF, she met with Muldowney to discuss her situation, and during that meeting they discussed the possibility of L'Argent moving back to OPF3.  (Doc. 63, Att. 9 at 8).  At that time, HMF was conducting screen testing, in which L'Argent had become involved, and she requested to stay at HMF until the testing was completed, which would have taken several months.[18]  (*Id*.).  They scheduled another meeting to discuss her return to OPF3 after the screen testing was complete. (*Id*.).  However, when Gary Barrett (to whose HMF team L'Argent had been assigned) went to get L'Argent for the meeting, L'Argent "left," and no meeting was held.  (*Id*. at 8-9).  After that, Muldowney told L'Argent that she could work overtime at OPF3 if it were available, and according to the rules established for overtime.[19]  (*Id*. at 9).

*4) Overtime issues*

Once a USA employee is approved for overtime, they are able to volunteer for available overtime work.  (Doc. 63, Att. 10 at 7).  QCIs are not guaranteed overtime work.  (Doc. 58, Att. 5 at 7).  Instead, USA follows an objective system of offering overtime in order to ensure equal

_____

[18] Muldowney was not aware of L'Argent's complaints that she was not getting overtime work at HMF, and states that one of L'Argent's reasons for wanting to stay at HMF during the screen testing was because overtime work was available.  (Doc. 63, Att. 9 at 9).  L'Argent actually requested to remain at HMF for an additional six months.  (Doc. 58, Att. 8 at 2).

[19] For example, overtime work would have first been offered to employees working in OPF3, and then to the other OPFs and HMF.  (Doc. 63, Att. 9 at 9).

distribution of opportunities among its employees.  (Doc. 58, Att. 6 at 4).  The first consideration

is whether an employee (who is the most senior) is certified and qualified to perform the work in

question.  (Doc. 58, Att. 6 at 4; Doc. 63, Att. 10 at 8).  Next, employees are ranked in terms of the

amount of overtime they have worked, and the employee with the lowest amount is asked if they

are available.  (*Id*.).  USA then continues to moves up the list until the overtime requirements are

filled.  (*Id*.).  The amount of overtime work available in different departments, such as OPF3 or

HMF, depends on the nature of the work being performed in a department at any given time, and

thus departments fluctuate in terms of the amount of overtime available to employees.  (*Id*. at 9).

　　　After her transfer to HMF, L'Argent was not able to work as many overtime hours as she

could have worked if she had remained at OPF3.  (Doc. 63, Att. 2 at 6).  During her initial six

months at HMF, she was unable to work overtime hours at all.  (*Id*.).  After L'Argent complained

about her inability to work overtime, she began to be offered overtime work approximately six

months after her transfer to HMF.  (*Id*. at 6-7).  Barrett states that overtime work was offered to

her when he felt that she was proficient in the skills critical to performing certain tasks, because

she had not previously worked at HMF and needed to get to know the facility, to understand the

hardware, and to become familiar and comfortable with her job.[20]  (Doc. 58, Att. 6 at 5; Doc. 63,

Att. 10 at 7).  USA also made arrangements so that L'Argent could work overtime hours at OPF3,

which is rarely done at USA.[21]  (Doc. 63, Att. 10 at 7).  After L'Argent was approved to work

---

[20] Barrett asserts that this transition period took less than sixty days.  (Doc. 63, Att. 10 at 7).
He was the person that gave approval for L'Argent to work overtime.  (*Id*.).

[21] L'Argent asserts that she was not offered, and did not work, overtime at OPF3 after her
transfer to HMF.  (Doc. 63, Att. 2 at 7).  This was initially true because, due to the uncomfortable
situation giving rise to all of these events, Muldowney had instructed Barrett not to offer L'Argent
overtime at OPF3.  (Doc. 58, Att. 6 at 5).  L'Argent did, however, have the option to work overtime

overtime, she did work overtime hours at HMF.  (*Id*.).  By the end of 2003, L'Argent had a comparable number of overtime opportunities as other similar QCIs at HMF.  (Doc. 58, Att. 6 at 6).

### 5) Performance reviews

In the summer of 2003 L'Argent, along with all of the other HMF employees, began receiving monthly performance appraisals from Barrett.  (Doc. 63, Att. 8 at 26; Att. 10 at 5-6).  USA has a program called the "Vision Support Plan," which outlines six company goals, and the metrics regarding how the company is meeting those goals are produced monthly.  (Doc. 63, Att. 10 at 5).  Barrett instituted these reviews in order to fulfill his managerial requirement that he demonstrate that his department was meeting company goals.[22]  (*Id*.).  L'Argent received low scores on these appraisals.  (Doc. 63, Att. 8 at 26).  Barrett told her that she received low scores because she had "gone over his head" when she complained about the lack of overtime work, and that she needed to learn communication skills.  (*Id*. at 27-28).  L'Argent acknowledges that she broke an appointment for a meeting with Stratton, which constituted a refusal to meet with management, and which Barrett noted in one of his appraisals.[23]  (*Id*. at 29; Doc. 63, Att. 10 at 6).  These reviews were not coupled with the loss of pay, benefits or other employment opportunities.  (Doc. 58, Att. 6 at 4).

―――――――――――――

at OPF3 if the requirement arose and that facility requested help from the QCIs at HMF.  (Doc. 58, Att. 8 at 2).

[22] Barrett states that L'Argent's transfer to HMF was not a factor in his decision to start monthly reviews.  (Doc. 63, Att. 10 at 6).

[23] Barrett gave her a low score in the category entitled, "Judgment" because of her failure to attend several meetings.  (Doc. 58, Att. 6 at 4).

*6) Other issues*

L'Argent asserts that she heard rumors, and that other employees told her, that Barrett had taken action against her because of her complaint against Todd.[24]  (Doc. 63, Att. 7 at 1-5).  For example, she was told by another HMF employee that Barrett had instructed that employee to make copies of all of L'Argent's paperwork, an instruction which applied only to L'Argent, not any of the other HMF QCIs.[25]  (Doc. 63, Att. 8 at 15-16).

L'Argent is not the only employee to be transferred from other locations to HMF.  (Doc. 63, Att. 7 at 29-30).  In fact, the majority of the employees at HMF were transferred there from other areas.[26]  (*Id* at 31).  Since L'Argent has worked at HMF, no employees have been terminated from that department.  (Doc. 63, Att. 7 at 7).  While working at HMF, L'Argent has acquired additional certifications, including hardline, breathing, SCAPE and welding.  (Doc. 63, Att. 7 at 37).

C. Claims and Arguments

L'Argent has brought two claims against USA, alleging retaliation in violation of the Florida Civil Rights Act, Florida Statutes section 760, *et seq.* ("FCRA") (Count I) and Title VII of

---

[24] Barrett denies that L'Argent's negative performance reviews were the result of her prior claims of harassment, because he was unaware of those claims when he issued her performance reviews.  (Doc. 58, Att. 6 at 4).

[25] Barrett denies this allegation, and states that he did not copy and review anyone's work, nor did he direct any other employee to review L'Argent's work.  (Doc. 63, Att. 10 at 10).  In any event, L'Argent's testimony is based on hearsay, and thus she cannot rely on it to defeat USA's summary judgment motion.  *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996).

[26] L'Argent asserts that employees have been transferred to HMF for a number of reasons, including making complaints about another employee, to prevent nepotism, and for advocating on behalf of a union, and for missing too much time at work.  (Doc. 63, Att. 7 at 32-35).  L'Argent came by these beliefs from conversations with other employees and from rumors.  (*Id*. at 34-35).

the Civil Rights Act, 42 U.S.C. section 2000e, *et seq.* ("Title VII") (Count II).  She alleges that USA retaliated against her after she made complaints of sexual harassment and retaliation and after she filed a charge with the EEOC and the Florida Commission on Human Relations.  She asserts that this retaliation occurred in several forms: (1) her transfer from the OPF3 to the HMF; (2) the inability to work overtime after the transfer; (3) after her transfer, she had to be escorted because she lacked the proper badge; (4) she lacked all of the certifications required for the HMF and thus was unable to perform certain duties; (5) she began receiving monthly performance appraisals and received low scores on those appraisals; and (6) her supervisor required that her paperwork be inspected.

USA has moved for summary judgement, arguing that L'Argent cannot establish a *prima facie* case of retaliation under Title VII and FCRA, and that even if she could do so, she cannot rebut USA's legitimate non-retaliatory reasons for their actions.

## II.      Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving

party must "go beyond the pleadings and by [her] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).   Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.   The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[27]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.   The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments.  *Beal*, 20 F.3d at 458-59.   If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial.  *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

---

[27] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

**III.   Legal Analysis**

A. Title VII Retaliation[28]

Title VII makes it unlawful for an employer to discriminate against any employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

Title VII's burden-shifting standard applies here.  *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993) ("The burden of proof in Title VII retaliation cases is governed by the framework established" in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).).  Thus, (1) initially, L'Argent must establish a *prima facie* case of discrimination; (2) USA must then respond with a legitimate, nondiscriminatory reason for its actions; and (3) to prevail, L'Argent must establish that USA's articulated reason was merely a pretext to mask unlawful retaliation. *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998); *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).

To prove a *prima facie* case of retaliation under Title VII,

> a plaintiff must establish (1) that there was a statutorily protected participation; (2) that an adverse employment action occurred; and (3) that there was a causal link between the participation and the adverse employment action.

*Padron v. Bellsouth Telecomm., Inc.*, 196 F. Supp. 2d 1250, 1255 (S.D. Fla. 2002); *Raney v. Vinson Guard Svc., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997).[29]  To show "statutorily protected

---

[28] Decisions construing Title VII are applicable when addressing the FCRA, because the Florida Act was patterned after Title VII.  *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).  Therefore, the Court's analysis here applies with equal force to L'Argent's FCRA claim.

[29] This is the test to be applied when relying on circumstantial evidence.  *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).

participation," the plaintiff must show that she opposed an unlawful employment practice which she reasonably believed occurred. *Padron*, 196 F. Supp. 2d at 1225; *Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989) ("claim does not require that the employer actually have been engaged in an unlawful employment practice," only that plaintiff have had a reasonable belief that such an unlawful practice occurred).

An "adverse employment action" is any ultimate employment decision, such as a discharge "or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). "[I]f an employer's conduct negatively affects an employee's salary, title, position, or job duties, that conduct constitutes an adverse employment action." *Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1300 (11th Cir. 2005). Thus, "a transfer to a less desirable position in terms of pay or eligibility for pay increases is an adverse employment action because it is equivalent to a demotion." *Id*. at 1301. To constitute an adverse employment action, the action must be tangible or, in other words, "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 512 (11th Cir. 2000); *see also Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) ("[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment.") (emphasis in original). When considering the nature of the action, "the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must

be materially adverse as viewed by a reasonable person in the circumstances." *Davis*, 245 F.3d at 1239.

To establish a causal link, the plaintiff must show that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta*, 212 F. 3d at 590 (internal citation, quotations and punctuation omitted). That element may be shown, for the purposes of proving a *prima facie* case, by showing a close temporal proximity between the protected activity and the adverse action, to show that the two were not wholly unrelated. *Id.*; *Padron*, 196 F. Supp. 2d at 1256.

Once the plaintiff establishes a *prima facie* case, an inference of retaliation is created. *Goldsmith*, 996 F.2d at 1163; *Doyal v. Marsh*, 777 F.2d 1526, 1534 (11th Cir. 1985). The burden of production then shifts to the defendant to rebut the inference of retaliation by producing at least one legitimate non-discriminatory reason for the adverse employment action. *E.E.O.C. v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1572 (11th Cir. 1993). The defendant does not have to persuade the court that it was actually motivated by those reasons. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Instead, the defendant must only offer sufficient evidence to create a genuine issue of fact as to whether it discriminated against the plaintiff, and may do so by introducing evidence demonstrating the reasons for the action taken against the plaintiff. *Id.* at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (noting that this burden "is one of production, not persuasion"). The defendant's explanation in this regard must be "legally sufficient to justify a judgment for the defendant."[30] *Burdine*, 450 U.S. at 254.

---

[30] At the same time, however, the defendant's burden is only one of production, not of proof, and this burden is "exceedingly light." *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

If the defendant offers legitimate reasons, the presumption of retaliation disappears, and the plaintiff must then show that the employer's proffered reasons for taking the adverse action were merely pretextual. *Reichhold Chems.*, 988 F.2d at 1572; *Tidwell* v. Carter Prods., 135 F.3d 1422, 1426 (11th Cir. 1998). The plaintiff may do so either by "persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Summary judgment in favor of the employer is proper where the plaintiff fails to satisfy the burden of establishing that the employer's reasons were pretextual. *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004). Although the burden of production shifts during this process, the burden of persuasion remains with the plaintiff. *Reichhold Chems.*, 988 F.2d at 1572.

B. L'Argent

L'Argent's claims boil down to three issues: (1) she was transferred to HMF; (2) as a result of that transfer she was unable to work as many overtime hours as before; and (3) her new assignment was less prestigious.[31]

---

[31] The other asserted grounds for retaliation are either insufficient or meritless. Her allegations that she lacked the proper badge, lacked certain certifications upon her transfer to HMF, and that her supervisor required that her paperwork be inspected do not represent significant or tangible changes. *See*, e.g., *Gupta*, 212 F.3d at 588. Performance appraisals, and low scores on such appraisals, are not grounds for a Title VII retaliation claim. *Davis*, 245 F.3d at 1241-42 ("Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance. . . . Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely--without more--establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause."). The fact that she may have had to travel farther to work after her transfer is equally insufficient. *See Evans v. Ala. Dept. of Corr.*, --- F. Supp. 2d ----, 2005 WL 3804818 at *4 (M.D. Ala. Apr. 11, 2005) ("Where the changed

*1) Transfer to HMF*

L'Argent's transfer to HMF, by itself, does not constitute an adverse employment action. She has not established that she suffered a loss of any salary or benefits, or that the transfer caused a significant impact on any of the terms or conditions of her employment.  Indeed, she maintained the same title, and performed essentially the same duties.[32]  The fact that L'Argent did not want to be transferred to HMF is irrelevant.  *See Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998) (when determining existence of adverse employment action, courts are not bound by plaintiff's subjective preferences).  Finally, L'Argent found herself in an unpleasant situation to which she contributed by starting a relationship with a co-worker, and her employer attempted to help alleviate that unpleasantness and did so, at least in part, at L'Argent's suggestion.[33]  Such an employment action under these circumstances cannot realistically be considered adverse.[34]

Even if her transfer could be considered an adverse employment action, and presuming that she could establish a *prima facie* case of retaliation, her claim would still fail because she has

work location does not even require one to change residences, these transfers generally merely create an inconvenience, which for purposes of Title VII is not actionable.") (internal citation and quotation omitted); *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (transfer requiring increase in commute time from seven minutes to as many as forty minutes did not constitute adverse employment action).

[32] Although L'Argent asserts that HMF was more hazardous than OPF3, she has offered no evidence to substantiate that claim, nor has she demonstrated how the alleged hazardous condition negatively affected her.

[33] L'Argent initially suggested that Todd's transfer out of OPF3 to OPF1 was not working out and that a greater geographical separation between them was necessary.

[34] The situation L'Argent created by becoming sexually involved with a coworker placed USA in what amounted to a no-win situation.  As a result of transferring L'Argent to try and remedy the situation to which she contributed, USA found itself defending this action.  However, had USA not done anything, it could very easily have found itself defending a claim for creating a hostile work environment or other related claim (although the Court doubts the viability of such a claim).

failed to rebut USA's legitimate reasons for the transfer.  Muldowney gave fairly detailed reasons for her decision to transfer L'Argent (instead of Todd or other employees) to HMF, all of which boiled down to the fact that transferring L'Argent was more practical, could be accomplished easier, and would more completely resolve the situation.  These are legitimate reasons for deciding to transfer L'Argent to HMF, and L'Argent has not demonstrated that they are either false or merely pretextual.[35]

### 2) Inability to work as many overtime hours

Next, L'Argent asserts that her transfer to HMF negatively affected her ability to work overtime hours.  L'Argent's arguments in this regard are that: (1) she was denied the opportunity to work overtime at OPF3 after her transfer to HMF; (2) she was denied the opportunity to work overtime at HMF for the first six months she was there; and (3) the amount of overtime available at HMF was less than that available at OPF3.  She has demonstrated, in some detail, the difference in the hours of overtime she could have worked and the amount of money she could have made in each area.  The Court thus presumes, for the purposes of this analysis, that L'Argent has established that she suffered an adverse employment action.  *See Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (finding adverse employment action where plaintiff presented evidence that, inter alia, he was "totally blackballed" from overtime); *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001) (collective weight of employer's actions which included repeated denial of overtime work, was sufficient to establish adverse employment action).

---

[35] Indeed, L'Argent notes that Muldowney discussed with her the fact that it would be simpler to transfer her rather than the other individuals involved, and she does not appear to dispute the veracity of Muldowney's assertion in that regard.  (Doc. 63, Att. 7 at 11-12).

Nevertheless, L'Argent's claim must fail because she has failed to offer evidence that USA's explanation of the overtime situation was mere pretext. First, regarding L'Argent's claim that she was unable to work overtime at OPF3 after her transfer to HMF, USA has offered evidence demonstrating that she could not work overtime at OPF3 because USA was attempting to separate her and Todd in order to alleviate the unpleasant situation that had arisen.[36] Second, as to her claim that she was unable to work overtime at HMF for the first six months she was there, USA has offered evidence that Barrett, her supervisor, waited to permit her to work overtime until he felt that she was qualified and familiar with her new job.[37] Third, there is no evidence that anything USA did in terms of transferring her to HMF was done in order to cause her to lose overtime. Ultimately, the fact that she worked less overtime at HMF was simply a side effect of her transfer to that area, and L'Argent has failed to demonstrate otherwise. More specifically, she has not demonstrated that USA's proffered reasons are merely pretexts for retaliation. *See Aviles v. Cornell Forge Co.*, 183 F.3d 598, 604 (7th Cir. 1999) (where plaintiff claimed that employer denied him overtime, plaintiff could not survive summary judgment on retaliation claim because

---

[36] In addition, after L'Argent complained about the lack of overtime, Muldowney told L'Argent that she could return to work overtime at OPF3 if it were available. L'Argent has not shown that USA was under any obligation to ensure that she received overtime work, or to do anything other than allow her to participate equally in the overtime system as it existed at USA, which appears to be exactly what USA did.

[37] There is a disparity in the relevant time period, with Barrett asserting that this transition period only lasted six weeks, as opposed to the six months claimed by L'Argent. L'Argent claims the fact that she could not immediately work overtime because of her supervisor's concerns that she was not sufficiently proficient shows that she was not qualified for the position at HMF, and therefore that her transfer constitutes an adverse employment action. USA has, however, shown that L'Argent was qualified and had the certifications necessary for this position. In any workplace, particularly in one as technical as that involving the inspection of the Space Shuttle, a change in job assignments will necessarily involve a transition period to allow the employee to become acclimated to, and become proficient at, his or her new tasks. Although six months may appear to be a long time, absent evidence demonstrating that it was unnecessary (which L'Argent has failed to provide), the Court is not in a position to judge USA's decision in that regard.

he failed to demonstrate that employer's reasons were pretextual); *Clipper v. Billington,* --- F.

Supp. 2d ----, 2006 WL 225834 at *7 (D.D.C. Jan. 31, 2006).

     *3) Loss of prestige*

     "In a Title VII case, a transfer to a difference position can be "adverse" if it involves a

reduction in pay, prestige or responsibility." *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d

821, 829 (11th Cir. 2000). The impact of the employment action cannot be speculative; instead, it

must have at least a tangible adverse effect on the plaintiff's employment. *Davis*, 245 F.3d at

1239. Courts are to apply an objective test, and ask whether a reasonable person in the plaintiff's

position would view the employment action at issue as materially adverse. *Hinson*, 231 F.3d at

829; *Davis*, 245 F.3d at 1239 ("[T]he employee's subjective view of the significance and adversity

of the employer's action is not controlling . . . .").

     L'Argent's assertions regarding the comparative prestige of her position at OPF-3 and

HMF center on three points: (1) at OPF-3 employees work "hands-on" directly on the Space

Shuttle, whereas at HMF they do not, and thus OPF assignments are more prestigious and coveted;

and (2) negative comments from other employees about HMF, including that HMF is the last place

an employee is sent before they are terminated; and (3) that L'Argent and other employees refer to

HMF as the "land of the misfit toys." The Court will address these in reverse order.

     First, L'Argent has offered no substantive evidence that HMF is, in fact, the area to which

employees are transferred because they are "misfits."[38] Her subjective opinion is not sufficient to

---

     [38] L'Argent's assertion in this regard also appears to be based on hearsay, (*see* Doc. 63, Att. 7 at 34-35), which would not be admissible to support her claims. *See Pritchard*, 92 F.3d at 1135.

carry her burden.  Second, any "evidence" that she has regarding HMF being a "last stop" is based

solely on hearsay testimony, which is inadmissible on a motion for summary judgment, and thus

carries no weight in this analysis.[39]  *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).

L'Argent's assertion in this regard is further undermined by her admission that she does not know

of anyone who has been fired (or has been "walked out the door") from HMF, and that since she

has been employed there, no one has been terminated from HMF.  (Doc. 63, Att. 7 at 6-7).

Third, the assertion that L'Argent lost prestige when she was transferred because she no

longer works directly on the space shuttle, by itself, simply cannot suffice to constitute an adverse

employment action.  L'Argent has offered no testimony from other witnesses to support her

assertion that her transfer to HMF was a transfer to a less prestigious facility, and thus relies solely

on her own assertion, which is insufficient.  *See Ren v. Univ. of Cent. Fla. Bd. of Trs.*, 390 F.

Supp. 2d 1223, 1234 n.13 (M.D. Fla. 2005) (plaintiff's conclusory allegation that supervisor's

action could only have been intended to have a negative impact on plaintiff was insufficient);

*Graham v. State of Fla., Dept. of Corr.*, 1 F. Supp. 2d 1445, 1450 (M.D. Fla. 1998) ("Plaintiff's

unhappiness with the reassignment does not make the reassignment adverse.").  She has not

offered, for example, evidence that her transfer to HMF has negatively affected either her

opportunities for promotion or pay increases or her image and standing at USA,[40] nor has she

demonstrated that other potential employers would view her transfer as a negative.  *Collins v.

Miami-Dade County*, 361 F. Supp. 2d 1362, 1373 (S.D. Fla. 2005) (despite claim of loss of

---

[39] Hearsay testimony may be admissible if it falls within an exception to the hearsay rule. *Macuba*, 193 F.3d at 1322-23.  L'Argent has not shown, and the Court does not find, that any such exception applies here.

[40] In fact, L'Argent's salary and benefits remained the same.

prestige, plaintiff failed to demonstrate adverse employment action where she failed to show tangible injury resulting from transfer).

Viewing her claim objectively, the Court cannot conclude that a reasonable person in these circumstances would find that L'Argent suffered a tangibly or materially adverse effect on her employment, particularly in light of the fact that she requested to remain at HMF in order to continue working on a certain project.[41]  *See Davis*, 245 F.3d at 1244 (fact that plaintiff may have felt blow to professional image was not sufficient to prevail); *Slattery v. Neumann*, 200 F. Supp. 2d 1367, 1375 (S.D. Fla. 2002) (noting that, "[a] reassignment to a job that one considers relatively meaningless is not an adverse employment action especially where there was good cause for a transfer.").[42]

---

[41] Even if the Court presumed that L'Argent had established the existence of an adverse employment action based on the loss of prestige, USA has offered legitimate, non-discriminatory reasons for her transfer to HMF (*see* discussion in sections III(B)(1) and (2), *supra*), which reasons she has failed to rebut and thus has failed to carry her burden in this regard.

[42]

> In the vast majority of instances . . . an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause . . . . A contrary view would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated in the federal courts.  Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions.

*Davis*, 245 F.3d at 1244, 1245.  Ultimately, even viewing L'Argent's transfer, loss of overtime, and asserted loss of prestige together, her claim of retaliation still must fail.  Assuming that these factors combine to establish an adverse employment action, USA has offered legitimate, non-discriminatory reasons for its actions, and L'Argent has not carried her burden of persuasion because she has not rebutted those reasons, either separately or in combination.

**IV.     Conclusion**

L'Argent became involved in a romantic relationship with a coworker, and that relationship quickly soured.  After she complained about the actions of her former significant other, USA sought to remedy the situation in the most pragmatic and effective way, by transferring L'Argent to a facility where she would be free of the social entanglements associated with her former relationship.  It is doubtful that USA's action actually constituted an adverse employment action but, even it did, USA has proffered legitimate, non-discriminatory reasons for L'Argent's transfer and decrease in overtime hours, which reasons L'Argent has failed to rebut.  Therefore, L'Argent has failed to carry her burden in this case.  Finally, L'Argent's claims appear to be little more than an attempt to force the Court to make *post-hoc* judgments about the legitimate business decisions USA made in resolving a clearly difficult personnel issue, but it is not the Court's place to do so.  Accordingly, it is

**ORDERED THAT** the Defendant, USA's Motion for Summary Judgment (Doc. 61) is GRANTED.  This case is removed from the June 27, 2006 trial docket, and the Clerk is directed to enter judgment for the Defendant, USA, and close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 16, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

-24-